**Lansing, Michigan**

# Opinion

Chief Justice:        Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED MAY 4, 2012

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* C. I. MORRIS, Minor.

No. 142759

*In re* J. L. GORDON, Minor.

No. 143673

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

These combined cases require us to examine the Indian Child Welfare Act (ICWA), 25 USC 1901 through 1963. In particular, we must decide several issues relating to ICWA's notice provision, 25 USC 1912(a), which mandates that notice of certain involuntary child custody proceedings be sent to the appropriate Indian tribe or to the Secretary of the Interior "where the court knows or has reason to know that an Indian child is involved . . . ." Because the question whether notice violations occurred in the instant cases begins with determining whether the tribal-notice requirement of 25 USC 1912(a) was triggered, we must first consider the indicia of Indian heritage that will

suffice to trigger the notice requirement. We must also consider whether a parent can waive the rights granted by ICWA to an Indian child's tribe and determine the appropriate recordkeeping requirements necessary to document the trial court's efforts to comply with ICWA's notice provision. Finally, we must determine the proper appellate remedy for violations of ICWA's notice provision.

While it is impossible to articulate a precise rule that will encompass every possible factual situation, in light of the interests protected by ICWA, the potentially high costs of erroneously concluding that notice need not be sent, and the relatively low burden of erring in favor of requiring notice, we think the standard for triggering the notice requirement of 25 USC 1912(a) must be a cautionary one. Therefore, we hold first that sufficiently reliable information of virtually any criteria on which tribal membership might be based suffices to trigger the notice requirement. We hold also that a parent of an Indian child cannot waive the separate and independent ICWA rights of an Indian child's tribe and that the trial court must maintain a documentary record including, at minimum, (1) the original or a copy of each actual notice personally served or sent via registered mail pursuant to 25 USC 1912(a) and (2) the original or a legible copy of the return receipt or other proof of service showing delivery of the notice.[1] Finally, we hold that the proper remedy for an ICWA-notice violation is to conditionally reverse the trial court and remand for resolution of the ICWA-notice issue.

---

[1] As noted in part IV(C), a complete record should also include any additional correspondence between the Department of Human Services, the trial court, and the Indian tribe or other person or entity entitled to notice.

In both the instant cases there existed sufficient indicia of Indian heritage to trigger the notice requirement of 25 USC 1912(a), yet neither trial court determined whether tribal notice had been properly made. Thus, in neither case did the trial courts determine whether—in addition to state law—the substantive and procedural protections of ICWA applied to the child custody proceedings.

Therefore, in *In re Morris* we reverse the judgment of the Court of Appeals with regard to the use of the conditional-affirmance remedy, conditionally reverse the trial court's termination of parental rights, and remand to the trial court for resolution of the ICWA-notice issue. In *In re Gordon* we reverse the judgment of the Court of Appeals, conditionally reverse the trial court's termination of parental rights, and remand to the trial court for resolution of the ICWA-notice issue.

## I. FACTS AND PROCEDURAL HISTORY

In both cases, parental rights were terminated pursuant to Michigan law, even though the trial courts never conclusively determined whether ICWA applied to the proceedings.[2]

---

[2] Assuming ICWA does not apply to these child custody proceedings, we conclude that neither Court of Appeals panel in the instant cases clearly erred in holding that parental rights were properly terminated pursuant to Michigan law. See *In re Morris*, unpublished opinion per curiam of the Court of Appeals, issued May 19, 2011 (Docket Nos. 299470 and 299471) (readopting the court's February 17, 2011 opinion with regard to termination under state law); *In re Gordon*, unpublished opinion per curiam of the Court of Appeals, issued August 11, 2011 (Docket No. 301592).

## A. *In re MORRIS*

C. I. Morris is the daughter of N. Brumley and D. Morris. The Department of Human Services (DHS) became involved in December 2008 when the newborn child tested positive for cocaine. Brumley admitted using cocaine and engaging in prostitution while pregnant. D. Morris admitted that he knew about Brumley's cocaine use and prostitution. The DHS filed a temporary-custody petition for jurisdiction over the infant and to remove her from her mother's custody.

At the December 11, 2008 preliminary hearing, both parents indicated that they had Indian heritage. The father stated that his great-grandmother was Indian and that he believed she was a member of the Cherokee tribe. The mother stated that her heritage also included Cherokee Indian. Without further addressing the child's Indian heritage, the trial court ordered the child placed into foster care. The order entered after the preliminary hearing included a checked box for the following statement: "The child is a member of or eligible for membership in an American Indian tribe or band named CHEROKEE (complete and mail form JC48)." Immediately following that statement, the order provided, "The findings required by MCR 3.980 have been made on the record."[3] It appears, however, that tribal notice was never made.

At the April 7, 2009 adjudication trial, the referee found that one or more of the allegations in the petition were substantiated and that it was proper to exercise

---

[3] At the time of these proceedings, MCR 3.980 was still in effect and required the trial court to ensure that notice of the proceedings was given to the child's tribe and the child's parents. As of May 1, 2010, MCR 3.980 has been replaced by MCR 3.905 and MCR 3.967.

jurisdiction over the child. The referee further ordered both parents to comply with parent–agency agreements (PAA), with the goal being reunification. Approximately one year later, the trial court ordered the DHS to file a supplemental petition seeking termination of both parents' parental rights because they had failed to substantially comply with their PAAs and had failed to benefit from the services that were offered. On July 21, 2010, the referee found that the child could not safely be returned to the parents within the foreseeable future and the court terminated both parents' parental rights, finding that the cited statutory grounds were demonstrated by clear and convincing evidence and that termination was in the child's best interests.[4]

Brumley and D. Morris appealed, but did not raise the Indian-heritage issue in the Court of Appeals. Instead, the DHS raised sua sponte the insufficiency of notice to the Indian tribe under ICWA. In its response to the parents' consolidated appeals, the Attorney General admitted that the record did not disclose whether ICWA notification had been completed. Rather than reverse the trial court, the Attorney General urged the Court of Appeals to conditionally affirm the termination but remand so that proper notice could be provided to any interested tribe. The Court of Appeals affirmed the termination, however, without addressing the ICWA-notice issue or petitioner's admission of error. See *In re Morris*, unpublished opinion per curiam of the Court of Appeals, issued February 17, 2011 (Docket Nos. 299470 and 299471).

---

[4] The statutory grounds for termination relied on by the trial court were MCL 712A.19b(3)(c)(*i*), (g), (j), and (m).

5

D. Morris alone applied for leave to appeal in this Court. In lieu of granting leave to appeal, we vacated that portion of the Court of Appeals judgment resolving the father's appeal and remanded to the Court of Appeals for resolution of the ICWA-notice issue. In doing so, we expressly retained jurisdiction. *In re Morris*, 489 Mich 877 (2011). On remand, the Court of Appeals readopted its February 17, 2011 opinion with regard to termination of D. Morris's parental rights, conditionally affirmed the termination of parental rights with regard to both parents, and remanded to the trial court for resolution of the ICWA-notice issue. *In re Morris*, unpublished opinion per curiam of the Court of Appeals, issued May 19, 2011 (Docket Nos. 299470 and 299471). We granted D. Morris's application for leave to appeal, "limited to the issue whether the Court of Appeals 'conditional affirmance' remedy is an appropriate method of resolving an ICWA violation." *In re Morris*, 489 Mich 957 (2011). We now reverse, but only with regard to the use of the conditional-affirmance remedy.

## B. *In re GORDON*

C. Hinkle gave birth to J. L. Gordon in May 2007.[5] When JL was just a few months old, Shiawassee County Child Protective Services (CPS) received a referral for neglect and improper supervision. Hinkle and JL were living in a condemned house with no electricity or running water, and Hinkle admitted being in an abusive relationship with a gang member and her own involvement with the gang. Hinkle also admitted that she fed the baby adult table food, that she did not regularly bathe him or change his diapers, and that she sometimes shook him and threw him to other persons. Shiawassee County

---

[5] The father's identity remains unknown.

6

CPS referred Hinkle for services, but she failed to participate and eventually went missing with JL.

In November 2007, while Hinkle was in jail on an unrelated conviction, she placed JL in a guardianship with Hinkle's maternal aunt, a Saginaw Chippewa tribal member. But when Hinkle was released from jail, the guardianship was terminated and JL returned to Hinkle's care. In May 2008, Hinkle resurfaced in Oakland County, and CPS again became involved after receiving a referral alleging that JL had been treated for second-degree burns to his hands after falling into a fireplace and that Hinkle had failed to bring the child back to the hospital's burn unit for follow-up care. When CPS found Hinkle, the caseworker ordered Hinkle to take JL to the hospital for treatment of his burned hands. Hinkle apparently did not do so.

The child was taken into protective custody. Caseworker Nina Bailey filed a petition on behalf of the DHS, seeking temporary jurisdiction over JL, which was granted on May 22, 2008. On July 21, 2008, Hinkle pleaded no contest to the allegations in the petition, and the court ordered Hinkle to comply with a PAA. Following a dispositional hearing in September 2008, JL was placed back with Hinkle's maternal aunt, the Saginaw Chippewa tribal member who had previously served as JL's guardian.

By April 2010, Hinkle had made little progress toward reunification. Her compliance with the PAA was sporadic and incomplete, she had been arrested on an unrelated criminal charge, she was requesting shorter and less frequent visitations with JL, and she continued to maintain inappropriate living conditions. At an April 8, 2010 permanency planning hearing, the court recommended that the DHS file a supplemental petition seeking termination of Hinkle's parental rights. After a three-day bifurcated

7

hearing concluding on November 1, 2010, the court terminated Hinkle's parental rights, finding that each of the statutory grounds alleged in the petition had been proven by clear and convincing evidence and that termination was in JL's best interests.[6]

The facts relevant to the ICWA-notice issue developed over the course of numerous hearings. At the May 21, 2008 hearing during which the DHS sought emergency custody of JL, Bailey indicated that neither Hinkle nor JL was a member of an Indian tribe and that they were not eligible for tribal membership. However, at the preliminary hearing on May 22, 2008, Hinkle stated that her family was part of the Saginaw Chippewa Indian Tribe in Mt. Pleasant. Hinkle seemed to indicate that she was not a member of the tribe, but the referee did not conclusively determine Hinkle's tribal status. Without further clarification from Hinkle, the referee stated: "That's okay, don't worry about it. So I will order DHS to do an investigation regarding that and notify the tribe for us and see if they want to respond to this case." The order issued after a June 3, 2008 hearing indicates "ICWA has been notified." At a hearing held on July 21, 2008, Bailey was asked about the status of the tribal notification. Bailey responded that she had sent a certified letter to the Saginaw Chippewa Indian Tribe and was notified by return receipt that the letter had been received, but she had not heard back from the tribe regarding membership or eligibility for membership.

At a September 2008 dispositional review hearing, Hinkle clarified that her biological mother was not a member of the tribe, but her mother's siblings were. Hinkle's mother was present in the courtroom and confirmed that there was Indian

---

[6] The statutory grounds for termination were MCL 712A.19b(3)(c)(*i*), (g), and (j).

8

heritage on her side of the family and that she was "waiting on that," which apparently meant that she was waiting to hear from the tribe about her own eligibility for membership. The assistant prosecutor reiterated that notice had been sent to the Saginaw Chippewa Indian Tribe, but no response had been received. The court directed the prosecutor to place a copy of the notice in the court file, and she agreed to do so, but the record does not include a copy of the notice.

At a hearing held on January 5, 2009, DHS caseworker Lisa Smith stated that an ICWA representative had requested more family history information from Hinkle, that the requested information had been provided, and that the DHS was awaiting a response. The court directed Smith to notify it when a response was received and place a copy in the court file. Smith agreed to do so, but again, the record includes no such ICWA documentation.

At an April 21, 2009 hearing, Smith told the court that Hinkle's mother had received direct notice from the tribe that the family was not eligible for tribal benefits. Hinkle's mother was present and stated that she had been notified that she and her descendents were not entitled to tribal benefits or money. Hinkle then attempted to clarify for her mother, stating, "My son and I don't have enough heritage to get—to be part of the tribe in other words." The court stated that it was looking for "a letter" directly from the tribe. JL's foster mother stated that she is a tribal member and had tried to obtain information regarding JL's status from the tribe, but the tribe had refused to release the information to anyone but the DHS or the court. Smith reiterated that she had

"sent papers to ICWA."[7]  The court notified Smith that she needed to "contact them to see why they haven't responded because we need the response directly from ICWA.  And they're not going to send it to anybody else, they're going to send it to the [DHS] because you're the one that's making the request."  Smith agreed to contact the tribe.

On April 6, 2009, the court entered an order following a hearing, which noted, "Nothing received from ICWA—worker contacted ICWA again."  This is the last reference to ICWA that appears in the record.  The record includes no copies of the actual notices purportedly sent to either the Saginaw Chippewa Indian Tribe or the Secretary of the Interior.  There are no postal return receipts indicating whether notice was received and, if so, by whom.  Lastly, the record includes no documentation of any tribal response or other subsequent communications documenting the court's and the DHS's efforts to ensure compliance with ICWA.

Hinkle appealed the November 2010 termination decision, and the Court of Appeals affirmed.  *In re Gordon*, unpublished opinion per curiam of the Court of Appeals, issued August 11, 2011 (Docket No. 301592).  The Court of Appeals noted that Hinkle had objected to neither the manner nor the insufficiency of tribal notice pursuant to ICWA and concluded that, even in the absence of documentation, the record showed

---

[7] A review of the transcripts reveals that the repeated references to notifying "ICWA" are apparently references to notifications sent directly to the Secretary of the Interior.  We are unclear why notice would be sent to the Secretary of the Interior in this case.  Section 1912(a) only requires that notice be sent to the secretary if "the identity or location of the parent or Indian custodian and the tribe cannot be determined . . . ."  Hinkle specifically stated that some of her relatives were members of the Saginaw Chippewa Indian Tribe.  Thus, the appropriate tribe had been determined.

that the DHS had complied with ICWA. *Id*. at 4. Further, the Court of Appeals concluded that by stating that she and her son were not eligible for tribal membership, Hinkle had relieved the trial court from making further tribal-notification efforts. *Id.* Hinkle applied for leave to appeal in this Court, and pursuant to MCR 7.302(H)(1), we directed the clerk to schedule oral argument on whether to grant the application or take other action. *In re Gordon*, 490 Mich 917 (2011). Having heard oral arguments, we now reverse.

## II. STANDARD OF REVIEW

Issues involving the application and interpretation of ICWA are questions of law that are reviewed de novo. *In re JL*, 483 Mich 300, 318; 770 NW2d 853 (2009). A court's factual findings underlying the application of legal issues are reviewed for clear error. *People v LoCicero (After Remand)*, 453 Mich 496, 500; 556 NW2d 498 (1996).

## III. THE INDIAN CHILD WELFARE ACT

In 1978, Congress enacted ICWA in response to growing concerns over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Mississippi Band of Choctaw Indians v Holyfield*, 490 US 30, 32; 109 S Ct 1597; 104 L Ed 2d 29 (1989). Senate hearings conducted between 1974 and 1978 considered the harm of these child welfare practices, not only to the Indian children and their parents, but also to the Indian tribes. *Id.* at 32-34. In its statement of findings, Congress expressed the importance of protecting and preserving Indian families, Indian tribes, and tribal culture, stating the following:

11

(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . ;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. [25 USC 1901.]

In response to these findings, Congress declared that the policy of our nation is

to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . . [25 USC 1902.]

Thus, reflected in ICWA is a profound recognition of the separate and distinct rights of Indian tribes to their children, the most critical resource necessary to preserve not only tribal culture, but the tribes themselves. To address the problems identified in the hearings, ICWA establishes various substantive and procedural protections intended to govern child custody proceedings involving Indian children.[8]

Two provisions define the exclusive or presumptive jurisdiction of the tribal courts over Indian children. First, if an Indian child "resides or is domiciled within the

---

[8] Four types of proceedings are included in the definition of "child custody proceeding" found in 25 USC 1903(1)(i) through (iv): foster care placements, terminations of parental rights, preadoptive placements, and adoptive placements. See also MCR 3.002(1)(a) through (d). As discussed within this opinion, "Indian child" is defined by 25 USC 1903(4).

reservation of such tribe" or is a "ward of a tribal court," the child's tribe has exclusive jurisdiction "over any child custody proceeding." 25 USC 1911(a). Second, in state court foster care or termination of parental rights proceedings involving Indian children who are not wards of the tribal court and are not residents of or domiciled within a reservation, the parent, the Indian custodian of the child, or the Indian child's tribe may petition for the proceedings to be transferred to the tribal court. 25 USC 1911(b). In the absence of good cause to the contrary or declination by the tribal court, the state court "shall transfer" the proceedings to the tribal court. *Id.* Further, if the child is an Indian child and jurisdiction is not transferred to the tribal court, the child's tribe retains the right to intervene in any state court foster care placement or termination of parental rights proceeding. 25 USC 1911(c). Regardless of whether the tribe intervenes, if the child involved in the child custody proceeding is an Indian child, state courts must still conform to the heightened protections afforded by ICWA.[9] Therefore, before a state court can determine whether ICWA applies to the proceedings, the court must first make the critical determination whether the child is an "Indian child."

---

[9] The various protections afforded by ICWA in proceedings involving Indian children include the appointment of counsel, 25 USC 1912(b); the duty to show that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" in foster care placement or termination of parental rights proceedings, 25 USC 1912(d); a "determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" in foster care placement proceedings, 25 USC 1912(e); a "determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" in termination of parental rights proceedings, 25 USC 1912(f); and adoptive, preadoptive, and foster care placement preferences, 25 USC 1915.

As defined by ICWA, an "Indian child" is "any unmarried person who is under age eighteen and is either (a) a *member* of an Indian tribe or (b) is *eligible for membership* in an Indian tribe and is the biological child of a *member* of an Indian tribe." 25 USC 1903(4) (emphasis added).[10] Aside from the age and marital-status components, both subparts (a) and (b) require a determination of tribal membership or eligibility for tribal membership, and it is well established that only the Indian tribe can determine its membership. *In re Shawboose*, 175 Mich App 637, 639; 438 NW2d 272 (1989). Therefore, when there are sufficient indications that the child may be an Indian child, the ultimate determination requires that the tribe receive notice of the child custody proceedings, so that the tribe may advise the court of the child's membership status. And thus, ICWA includes 25 USC 1912(a), the notice provision.

Before turning to the specifics of the notice provision, however, we must briefly discuss ICWA's enforcement provision, 25 USC 1914, which provides a powerful collateral remedy for violations of ICWA's key provisions. That section provides:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, *and the Indian child's tribe* may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated *any provision* of [25 USC 1911, 1912, or 1913]. [25 USC 1914 (emphasis added).]

---

[10] "Indian tribe" is defined as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians . . . ." 25 USC 1903(8).

Pursuant to this provision—and with no apparent time limitation on when the collateral action may be brought—the Indian child, a parent, an Indian custodian of the child, or the child's tribe may petition a court to invalidate foster care placements and terminations of parental rights if the state court violated *any* provision included in 25 USC 1911, 1912, or 1913. The import of this powerful remedy is that such an action to invalidate the proceedings could be brought even after the children had established permanency with a new family.[11] Accordingly, the availability of the 25 USC 1914 remedy for violations of ICWA's key provisions must inform our decision, compelling us to decide this case in a way that urges our trial courts to ensure compliance with ICWA, including compliance with the notice provision.[12]

---

[11] For example, in *Holyfield*, the Indian tribe of twin children over which it had exclusive jurisdiction successfully used 25 USC 1914 to challenge a voluntary adoption two months after the entry of the final decree of adoption. *Holyfield*, 490 US at 38, 53. By the time the United States Supreme Court decided the case—holding that the chancery court had no jurisdiction to enter the adoption decree—the children had been with their adoptive parents for more than three years. *Id.* at 53.

[12] We point out why 25 USC 1914 is not an available remedy in either of the instant cases. That provision gives standing to the Indian child, the parents and the Indian custodians of the Indian child, and the Indian child's tribe. See also 25 USC 1903(9) (defining "parent"). Thus, while any one or more of the four parties may bring an action pursuant to 25 USC 1914, any such action is prefaced on the condition that the child meets the definition of an "Indian child" found in 25 USC 1903(4). Because only the Indian tribe can determine membership or eligibility for membership, an action brought under 25 USC 1914 must necessarily include a tribal determination of membership or eligibility for membership, even though the tribe itself need not intervene in the state-court proceedings. See *In re Kreft*, 148 Mich App 682, 684, 687-689; 384 NW2d 843 (1986) (holding that the respondent-mother in a termination action had standing to challenge the termination under 25 USC 1914, even though the Indian child's tribe, after intervening in the probate court, did not join the respondent in the appeal). In the instant cases, there have been no determinations that the children are Indian children, and thus, 25 USC 1914 is not available.

## IV.  THE NOTICE PROVISION OF ICWA, 25 USC 1912(a)

The notice provision of ICWA provides:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.  If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe.  No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.  [25 USC 1912(a).]

Several requirements can easily be extracted from the plain text of the statute.  First, 25 USC 1912(a) applies only to *involuntary* foster care placements and *involuntary* termination of parental rights proceedings occurring in state courts.[13]  Second, if the "knows or has reason to know" notice condition is triggered, the party seeking foster care placement or termination of parental rights has a duty to send notice of the proceedings to (1) the parent or Indian custodian and (2) the Indian child's tribe.  Third, the notice must be sent by registered mail with return receipt requested.  Fourth, the contents of the notice must advise, at minimum, of both the pending proceedings and the right of the party receiving the notice to intervene.  Fifth, if the party seeking termination cannot ascertain the identity of either (1) the parent or Indian custodian of the child or (2) the Indian

---

[13] Voluntary foster care placements, voluntary termination of parental rights proceedings, and voluntary adoptive placements are governed by 25 USC 1913.

child's tribe, then notice must be sent to the "Secretary," meaning the Secretary of the Interior.[14] Sixth, once the party seeking foster care placement or termination of parental rights receives the return receipt showing that delivery of notice has been made, a clock begins to run from the date of delivery shown on the return receipt. The tribe, parent, or Indian custodian has 10 days beginning on the date of receipt to respond to the notice, but may request up to an additional 20 days. Seventh, the trial court may hold no foster care placement or termination of parental rights proceedings until after the stated time periods have elapsed.[15] Thus, if the notice condition is triggered, the requisite notice must be sent and—other than necessary temporary orders pending resolution of the ICWA matter—the trial court may not hold any proceedings regarding either foster care placement or termination of parental rights until after passage of the requisite waiting periods: 10 days, or up to an additional 20 days if requested.

The application of the requirements of 25 USC 1912(a), however, is conditioned on whether the notice requirement is even triggered by indicia of Indian heritage sufficient to give the court actual knowledge or a "reason to know" that the child at issue is an Indian child.

---

[14] "Secretary" is defined as "the Secretary of the Interior." 25 USC 1903(11). Pursuant to 25 CFR 23.11(b) and (c)(2), when notice to the Secretary of the Interior is required under 25 USC 1912(a) for proceedings in Michigan, it is actually sent to the Minneapolis Area Director, Bureau of Indian Affairs.

[15] This does not mean that if the notice condition is triggered the children must automatically be returned to the home. As discussed in part V, until the ICWA-notice issue is resolved, the trial court need not change, and may order, temporary placements of the children because the mere triggering of 25 USC 1912(a) notice does not divest the court of jurisdiction.

## A. THE MEANING OF "REASON TO KNOW"

As we have noted, the requirements of 25 USC 1912(a) apply only when "the court knows or has reason to know that an Indian child is involved . . . ." There is no difficulty in a situation where the court knows an Indian child is involved. In that case, the court would be privy to sufficient information to determine that the child satisfies the definition of "Indian child" set forth in 25 USC 1903(4) (i.e., the child is unmarried, under age 18, and either [a] a member of an Indian tribe or [b] eligible for membership and the biological child of a member of an Indian tribe). The difficulty arises when the court "has reason to know that an Indian child is involved . . . ." Specifically, how much information suggesting the child has or may have Indian heritage suffices to give the court "reason to know" that an Indian child is involved?

We think the "reason to know" standard for purposes of the notice requirement in 25 USC 1912(a) should set a rather low bar. First, we find instructive the Bureau of Indian Affairs (BIA) guidelines, which suggest a permissive standard:

> Circumstances under which a state court has *reason to believe* a child involved in a child custody proceeding is an Indian include but are not limited to the following:
>
> (i) Any party to the case, Indian tribe Indian organization or public or private agency informs the court that the child is an Indian child.
>
> (ii) Any public or state-licensed agency involved in child protection services or family support has discovered *information which suggests that the child is an Indian child*.
>
> (iii) The child who is the subject of the proceeding gives the court *reason to believe* he or she is an Indian child.
>
> (iv) The residence or the domicile of the child, his or her biological parents, or the Indian custodian is known by the court to be or is shown to be a predominantly Indian community.

(v) An officer of the court involved in the proceeding has knowledge that the child *may be an Indian child*. [Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, B.1(c), 44 Fed Reg 67584, 67586 (November 26, 1979) (BIA Guidelines) (emphasis added).]

By using the terms "reason to believe," "suggests," and "may be an Indian child," this nonexhaustive list adopts a permissive standard we find consistent with the purposes animating ICWA. Further, our State Court Administrative Office recently adopted the BIA standards, with some slight variations, in its ICWA resource guide. [16]

Second, we also find instructive *BH v People ex rel XH*, 138 P3d 299, 303 (Colo, 2006), in which the Colorado Supreme Court examined this same issue and noted:

Precisely what constitutes "reason to know" or "reason to believe" in any particular set of circumstances will necessarily evade meaningful description. As in other contexts, reasonable grounds to believe must depend upon the totality of the circumstances and include consideration of not only the nature and specificity of available information but also the credibility of the source of that information and the basis of the source's knowledge. In light of the purpose of [ICWA], however, to permit tribal involvement in child-custody determinations whenever tribal members are involved, the threshold requirement for notice was clearly not intended to be high.

The court examined the BIA Guidelines and cases from other jurisdictions before concluding that "[b]ecause membership is peculiarly within the province of each Indian tribe, *sufficiently reliable information of virtually any criteria upon which membership might be based* must be considered adequate to trigger the notice provisions of the Act."

---

[16] See ICWA Special Committee, *Indian Child Welfare Act of 1978: A Court Resource Guide* (State Court Administrative Office, 2011), p 22 (hereinafter "SCAO ICWA Resource Guide"), available at <http://courts.michigan.gov/scao/resources/publications/manuals/cws/ICWACtResourceGuide.pdf> (accessed April 27, 2012).

*Id.* at 304 (emphasis added); see also *In re Antoinette S*, 104 Cal App 4th 1401, 1407; 129 Cal Rptr 2d 15 (2002) ("[T]he 'minimal showing' required to trigger notice under the ICWA is merely evidence '*suggest*[*ing*]' the minor 'may' be an Indian child . . . ."), quoting *Dwayne P v Superior Court*, 103 Cal App 4th 247, 258; 126 Cal Rptr 2d 639 (2002) (second alteration in original).

Third, we think the burden on the trial court and the DHS of complying with the notice requirement is minimal when compared to the potential costs of erroneously failing to send notice. At most, complying with 25 USC 1912(a) will extend the proceedings by some 30 days after the date the tribe or the Secretary of the Interior receives notice. If those entitled to notice do not respond within 10 days, the trial court may conduct the foster care placement or termination of parental rights proceedings. If the tribe replies to the notice, indicating that the child is not a member of the tribe and is not entitled to membership then, again, proceedings may resume. Finally, if those entitled to notice request an additional 20 days, then the court may have to wait a total of 30 days beyond the date the notice was received, as shown by the return receipt. An additional 30 days seems a comparatively low burden on the trial court and the DHS, especially when child custody cases generally take well over a year and the Indian heritage question will normally be raised at least by the time of the preliminary hearing. MCR 3.965(B)(2).[17] However, if the trial court errs by concluding that no notice is

---

[17] MCR 3.965(B)(2) requires that the court inquire about Indian heritage at the preliminary hearing. We recognize that MCR 3.965(B)(2) is not entirely consistent with this opinion because the court rule incorporates the definition of "Indian child" into the trial court's initial determination of whether notice must be sent to the tribe:

required and proceeds to place the child into foster care or terminate parental rights, the purposes of ICWA are frustrated and the Indian child, the parent or Indian custodian, or the Indian child's tribe may petition to have the proceedings invalidated pursuant to 25 USC 1914. Thus, the cost of making 25 USC 1912(a) notice is far less than the potential cost of incorrectly deciding that no notice is required.

For the foregoing reasons, we adopt the permissive standard articulated by the Colorado Supreme Court and hold that sufficiently reliable information of virtually any criteria on which membership might be based is adequate to trigger the notice requirement of 25 USC 1912(a).[18] Once sufficient indicia of Indian heritage are

---

> The court must inquire if the child or either parent is a member of an Indian tribe. If the child is a member, or if a parent is a member and the child is eligible for membership in the tribe, the court must determine the identity of the child's tribe, notify the tribe . . . . [MCR 3.965(B)(2).]

Only after the appropriate tribe responds can it be determined whether a parent, the child, or both are tribal members or are eligible for membership. And only with that information can the trial court determine whether the child meets the definition of "Indian child." Instead, the court rule should likely reflect a standard of "knows or has reason to know" or "knows or has reason to believe." This Court is considering opening an administrative file for the purpose of amending MCR 3.965(B)(2).

[18] A nonexhaustive list of indicia sufficient to trigger tribal notice includes situations in which (1) the trial court has information suggesting that the child, a parent of the child, or members of a parent's family are tribal members, (2) the trial court has information indicating that the child has Indian heritage, even though no particular Indian tribe can be identified, (3) the child's birth certificate or other official record indicates that the child or a parent of the child is of Indian descent, (4) the child, the child's parents, or the child's Indian custodian resides or is domiciled in a predominantly Indian community and (5) the child or the child's family has received services or benefits from a tribe or the federal government that are available to Indians. The state of California has codified a similarly permissive standard. See Cal Welf & Inst Code 224.3(b). While we recognize that California law is not binding on Michigan courts, we find California's codified

presented to give the court a reason to believe the child is or may be an Indian child, resolution of the child's and parent's tribal status requires notice to the tribe or, when the appropriate tribe cannot be determined, to the Secretary of the Interior. If there must be error in determining whether tribal notice is required, let it be on the side of caution.[19] See *In re MCP*, 153 Vt 275, 289; 571 A2d 627 (1989) ("To maintain stability in placements of children in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child.").

In the instant cases, we agree with the trial courts' initial determinations that there existed sufficient indicia of Indian heritage to require tribal notice. In *Morris*, both parents informed the court at the December 11, 2008 preliminary hearing that they had Cherokee Indian heritage. And while the record does not reflect whether any attempt to provide notice was made at that time, the order entered after the preliminary hearing indicates that "[t]he child is a member of or eligible for membership in an American Indian tribe or band named CHEROKEE . . . ." Likewise in *Gordon*, Hinkle informed

---

standard an instructive template for this opinion's nonexhaustive list of sufficient indicia of Indian heritage. See also BIA Guideline B.1(c), quoted earlier.

[19] There exist numerous possible scenarios in which a child may not appear to meet the ICWA definition of "Indian child" early in the proceeding, yet satisfy those conditions at some point during the pendency of the proceedings. For example, a tribe could determine that both a parent and the child are eligible for membership. In that case, if the parent accepts tribal membership, the child would meet ICWA's definition of "Indian child." It is likewise possible for a parent to be a tribal member since birth or early childhood, yet not be aware of her or his membership status until the tribe is contacted. See, e.g., *In re Termination of Parental Rights to Arianna RG*, 2003 WI 11, ¶ 17; 259 Wis 2d 563, 575; 657 NW2d 363 (2003) (noting that while many tribes require enrollment or registration, some automatically include descendents of members).

the court at the May 22, 2008 preliminary hearing that her family was part of the Saginaw Chippewa Indian Tribe, and the referee indicated that the DHS would be required to notify the Saginaw Chippewa tribe to conclusively resolve the issue. Thus, in both cases, we agree that the tribal-notice requirement of 25 USC 1912(a) was triggered because sufficient indicia of Indian heritage were presented to give the courts reason to believe that the children might be Indian children.

### B. PARENTAL WAIVER OF THE TRIBAL RIGHT TO NOTICE

In *Gordon*, we asked the parties to address whether a parent can waive a minor child's status as an Indian child or waive compliance with ICWA. This issue is easily resolved in the negative: a parent cannot waive either a child's status as an Indian child or any of the tribe's separate and distinct rights, as guaranteed by ICWA—including the right to notice under 25 USC 1912(a). The act makes clear that Indian tribes have "an interest in the child which is distinct from but on a parity with the interest of the parents." *In re Adoption of Halloway*, 732 P2d 962, 969 (Utah, 1986), quoted in *Holyfield*, 490 US at 52. In *Holyfield*, the United States Supreme Court stated:

> The numerous prerogatives accorded the tribes through the ICWA's substantive provisions . . . must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves. [*Holyfield*, 490 US at 49.]

In recognition of the tribe's protected interests in its children, the Court held that "[t]ribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe," *id.* at 49, and allowing a parent to avoid the tribe's right to exclusive jurisdiction over reservation domiciliaries would "nullify the purpose the ICWA was intended to accomplish," *id.* at 52. While the *Holyfield* case is framed within

23

the tribal right to exclusive jurisdiction, we conclude that the same principles hold true in the context of the tribal right to notice. Providing notice is a critical step to determining whether the separate and distinct tribal interests protected by ICWA are implicated. Tribes must be afforded the "opportunity to participate in determining whether the child is an Indian and to be heard on the issue of ICWA applicability." *BH*, 138 P3d at 303 (citations omitted).

Therefore, we hold that a parent cannot waive a child's status as an Indian child or any right of the tribe that is guaranteed by ICWA. See *id.* at 304 ("Because the protection of a separate tribal interest is at the core of the ICWA, . . . otherwise sufficiently reliable information cannot be overcome by the statements, actions, or waiver of a parent . . . ."), citing *Holyfield*, 490 US at 49, 52; *In re Marinna J*, 90 Cal App 4th 731, 733; 109 Cal Rptr 2d 267 (2001) ("Because the notice requirement is intended, in part, to protect the interests of Indian tribes, it cannot be waived by the parents' failure to raise it."). The Court of Appeals in *Gordon* clearly erred by holding that Hinkle's clarification had relieved the trial court from making further tribal-notification efforts.[20]

---

[20] We do not think that the purported communication from the tribe to Hinkle's mother about her eligibility for tribal benefits suffices for any purpose relevant to ICWA. First, the purported letter to Hinkle's mother had nothing to do with ICWA or the child custody proceedings. Second, it is not clear that ineligibility for tribal benefits equates with ineligibility for tribal membership. Lastly, the trial court was correct to conclude that the tribe's response to the notice of the child custody proceedings needed to be sent from the tribe or the Secretary of the Interior directly to the DHS or the trial court. A communication from a tribe to a relative of a respondent about eligibility for tribal benefits is insufficient to support any conclusion that ICWA does not apply to the child custody proceedings.

## C. 25 USC 1912(a) RECORDKEEPING REQUIREMENTS

In *Gordon*, 490 Mich 917, we asked the parties to address "whether the Department of Human Services and the family court are under a duty to make a complete record of their compliance with the notice requirements of the ICWA . . . ."[21] While the DHS personnel and the prosecutor made numerous assertions at various hearings that notice had been sent, the record in *Gordon* is devoid of any documentation of the DHS's efforts to notify either the Saginaw Chippewa Indian Tribe or the Secretary of the Interior. There are no copies of the actual notice purportedly sent. Nor does the record include any original or copy of a registered mail return receipt, which is necessary to show not only that notice was received, but also to determine when the 25 USC 1912(a) waiting period begins.[22] Lastly, while caseworker Smith stated to the trial court on January 5, 2009, that she had received and responded to a request for more family-history

---

[21] This issue was not raised in *Morris* because, by all accounts, there were no efforts to comply with 25 USC 1912(a) after the December 11, 2008 preliminary hearing, during which the trial court found that 25 USC 1912(a) was triggered but apparently did not otherwise comply with its requirements. However, our ruling regarding recordkeeping requirements applies equally to *Morris* on remand.

[22] We are unable to determine from the record in *Gordon* whether the notice referred to was sent via registered or certified mail. However, the text of 25 USC 1912(a) specifically requires *registered mail*. See also MCR 3.920(C)(1) (requiring notice to parents and tribes "by personal service or by registered mail with return receipt requested"). We note that there *are* differences between certified and registered mail, the latter of which is more secure. Additionally, the BIA recommends that only personal service—which affords greater protections—may substitute for registered mail. BIA Guidelines B.5(e), 44 Fed Reg at 67588. Because the trial court did not determine whether tribal notice had been made, we need not opine at this time on whether actual notice achieved via certified mail instead of registered mail would be subject to harmless error review. See, e.g., *In re Alexis H*, 132 Cal App 4th 11, 16; 33 Cal Rptr 3d 242 (2005); *Nicole K v Superior Court*, 146 Cal App 4th 779, 784; 53 Cal Rptr 3d 251 (2007).

information, no documentation of that correspondence appears in the record. This is so even though the court repeatedly instructed both the prosecutor and Smith to ensure that copies of the ICWA-related documents were placed in the court file. It is thus impossible to discern from the record in *Gordon* whether notice was actually sent, to whom it was sent, and whether the notices were received by the appropriate recipients.

While ICWA is silent regarding the recordkeeping requirements of 25 USC 1912(a) notice compliance, we find it essential that certain documents be included in the record. First, our State Court Administrative Office recently adopted the BIA recommendation that "[t]he original or a copy of each notice sent pursuant to this section shall be filed with the court together with any return receipts or other proof of service." BIA Guidelines B.5(d), 44 Fed Reg at 67588.[23] Second, without being able to review the return receipt, the trial court cannot determine whether the proper party actually received the notice sent by registered mail. Third, the trial court cannot determine the date on which the 25 USC 1912(a) waiting period begins to run without knowing the date on which the tribe or the Secretary of the Interior received the notice, as shown by the registered-mail return receipt. Fourth, with no copy of the actual notice in the record, the trial court cannot determine if the contents of the notice provided sufficient, accurate information to enable the tribal authorities to determine tribal status of the child and the child's parents. Finally, appellate courts cannot fulfill their appellate function without documentation in the record sufficient to allow review of a trial court's efforts to comply with 25 USC 1912(a).

---

[23] See SCAO ICWA Resource Guide, p 25 ("The original or a copy of each notice along with return receipts or other proofs of service must be filed with the court.").

26

Indeed, *Gordon* illustrates the necessity for a documentary record of the attempts to comply with the notice requirements of 25 USC 1912(a). The lack of documentation in the record in *Gordon* prevents us from determining if the contents of the notice were sufficient to apprise the intended recipient of the pending child custody proceeding. We likewise are unable to determine to whom the notices were sent, even though the transcript includes references to both the Saginaw Chippewa Indian Tribe and to "ICWA," the latter of which presumably means the Secretary of the Interior.[24] Further, there is an assertion in the January 5, 2009 hearing transcript that a notice recipient had requested additional family-background information, but we are unable to review either the purported request or any responses made to the request because the record includes neither. Lastly, we cannot determine when or if the notices were actually received by the Saginaw Chippewa Indian Tribe, which would allow us to determine when and if the 25 USC 1912(a) waiting period began to run.

Therefore, we hold that trial courts have a duty to ensure that the record includes, at minimum, (1) the original or a copy of each actual notice personally served or sent via registered mail pursuant to 25 USC 1912(a), and (2) the original or a legible copy of the return receipt or other proof of service showing delivery of the notice. In addition, it would be helpful—especially for appellate purposes—for the record to include any additional correspondence between the petitioner, the court, and the Indian tribe or other person or entity entitled to notice under 25 USC 1912(a).

---

[24] See n 7 of this opinion.

27

Having determined that the notice requirement of 25 USC 1912(a) was triggered in both cases before us and that the trial courts did not fully comply with that statute, we are left to consider the proper remedy for ICWA-notice violations.

## V. THE PROPER REMEDY: CONDITIONAL REVERSAL

Despite the best efforts of child-protection authorities and our trial courts, there will inevitably be the occasional, unintentional tribal-notice error. In neither of the instant cases did the trial courts conclusively resolve whether the children were Indian children, and therefore whether the act's substantive and procedural protections applied to the child custody proceedings was not determined. Although the trial court in *Morris* determined that tribal notice was required, it appears that notice was not made. And while there were apparently attempts in *Gordon* to comply with 25 USC 1912(a), the documentary record is insufficient to determine whether the Saginaw Chippewa Indian Tribe actually received the requisite notice.

Because ICWA and our court rules are silent regarding the proper remedy for 25 USC 1912(a) notice violations, we must choose the best of three remedies suggested by the parties and the amici curiae.[25] The first suggestion is to automatically reverse any proceedings occurring after the tribal-notice condition of 25 USC 1912(a) was triggered. The second proffered remedy is to conditionally reverse the trial court and remand for resolution of the ICWA-notice issue. The third possibility, which is substantively very

---

[25] Recent amendments of our court rules incorporate many ICWA standards. See, e.g., MCR 3.002; MCR 3.905; MCR 3.920(C); MCR 3.921; MCR 3.961(B)(5) and (6); MCR 3.965(B)(2) and (12)(b); MCR 3.967; MCR 3.977(A)(1). None of the relevant court rules, however, provides a remedy for ICWA-notice violations.

similar to the second, is to conditionally affirm the trial court and remand for resolution of the ICWA-notice issue. In *In re IEM*, 233 Mich App 438, 449-450; 592 NW2d 751 (1999), our Court of Appeals adopted the conditional-affirmance remedy, and it has since been applied in more than 20 cases.[26]

We are guided in our assessment of these three possible remedies by the following considerations: (1) deference to tribal interests, as expressed by ICWA, (2) the best interests of the children, both Indian and non-Indian, in establishing and maintaining permanency, (3) the need to encourage compliance with ICWA, especially in light of the potential effects of the 25 USC 1914 remedy when errors occur, and (4) the conservation of judicial resources.

We must first reject the automatic-reversal remedy. The primary argument offered in support of automatic reversal is that once the 25 USC 1912(a) notice requirement is triggered, the court has no jurisdiction to enter any foster care or termination of parental rights orders pending resolution of the tribal-notice issue. Therefore, it is argued, any proceedings occurring after the notice requirement was triggered must be automatically reversed. The main case cited in support of this argument is *In re NAH*, 418 NW2d 310, 311 (SD, 1988), in which the South Dakota Supreme Court concluded that "inadequate

---

[26] See, e.g., *In re TM (After Remand)*, 245 Mich App 181, 187; 628 NW2d 570 (2001); *In re NEGP*, 245 Mich App 126, 133-134; 626 NW2d 921 (2001); *In re Amyx/Amyx-Holmes*, unpublished opinion per curiam of the Court of Appeals, issued July 21, 2011 (Docket No. 301648); *In re Toia*, unpublished opinion per curiam of the Court of Appeals, issued August 13, 2009 (Docket Nos. 289465 and 289469). As we will explain, we overrule all Michigan cases applying the conditional-affirmance remedy to ICWA-notice violations.

notice to the tribes divests the trial court of jurisdiction to terminate parental rights to these Indian children; consequently, this court has no jurisdiction to address the merits of the case." The critical difference in *NAH*, however, was that the mother was a member of the Oglala Sioux Tribe and the court was able to positively conclude that the children were "Indian children entitled to the benefits and protections of [ICWA]." *Id.* Thus, because the court knew that ICWA applied to the proceedings, it was appropriate to automatically reverse the termination of parental rights.[27] The situation in *NAH* is not present in either of the instant cases, however, because it has yet to be determined whether the children involved are Indian children, whether ICWA applies, and whether the tribal court or the state court has jurisdiction.

Although the automatic-reversal remedy would be the most deferential to tribal interests and would be the most effective in stressing to courts the imperative need to comply with ICWA, we decline to adopt the argument that the mere triggering of notice pursuant to 25 USC 1912(a) strips the state court of jurisdiction over the matter and requires immediate return of the children to the home from which they were removed. Several ICWA provisions indicate that Congress did not intend for state courts to lose

---

[27] However, the *NAH* opinion does not include enough information for us to determine whether the Oglala Sioux Tribe had exclusive jurisdiction over the children pursuant to 25 USC 1911(a) or merely presumptive jurisdiction pursuant to 25 USC 1911(b). When a tribe has exclusive jurisdiction, then of course the state court has no jurisdiction to terminate parental rights. When a tribe merely has presumptive jurisdiction, however, we do not think that inadequate tribal notice automatically divests a state court of jurisdiction. Moreover, the merits of *NAH* have been questioned. See *In re Kerby*, 170 Or App 263, 268; 13 P3d 523 (2000) ("There is some question whether the South Dakota Supreme Court's jurisdictional ruling in [*NAH*] is correct.").

jurisdiction once the 25 USC 1912(a) notice requirement is triggered. For example, pursuant to 25 USC 1922, a state court may conduct an emergency removal and arrange temporary foster care placement of even a child over whom the tribal court has exclusive jurisdiction when an Indian child "who is a resident of or is domiciled on a reservation" is "temporarily located off the reservation . . . ." While ICWA does not address those children not explicitly covered by 25 USC 1922, it would make no sense for Congress to allow for emergency removal and temporary placement of Indian children over whom the Indian tribe has exclusive jurisdiction pursuant to 25 USC 1911(a), yet preclude those emergency and temporary measures for all others, especially when it has yet to be determined if the child qualifies as an Indian child and whether the tribal court has exclusive jurisdiction over, the right to intervene in, or no interest in the matter. See, e.g., *DED v State*, 704 P2d 774, 779 (Alas, 1985) (holding that the notice requirements of 25 USC 1912(a) do not apply to emergency custody proceedings held pursuant to 25 USC 1922); *In re SB*, 130 Cal App 4th 1148, 1162-1164; 30 Cal Rptr 3d 726 (2005) (recognizing the absurdity of applying various ICWA provisions to temporary detention proceedings and holding that Congress intended 25 USC 1922 "to apply to emergency removals and placements of *all* Indian children," not just those domiciled or residing within the reservation), citing HR Rep No. 95-1386, 2d Sess, p 25 (1978), reprinted in 1978 US Code Cong & Admin News, pp 7530, 7548.

Further, even when a petitioner has improperly removed an Indian child from the home or improperly retained custody, the child need not be returned to her or his parent or Indian custodian if doing so "would subject the child to a substantial and immediate danger or threat of such danger." 25 USC 1920. Finally, our conclusion is reinforced by

31

the fact that 25 USC 1912(a) contains no reference to jurisdiction. It seems unlikely that Congress would have intended the triggering of tribal notice under 25 USC 1912(a) to divest a court of jurisdiction, yet would choose not to include the word "jurisdiction" within the provision. The conspicuous absence of any reference to jurisdiction in 25 USC 1912(a) becomes especially meaningful when one considers that other ICWA provisions provide detailed treatment of jurisdiction. See 25 USC 1911(a) (exclusive tribal jurisdiction); 25 USC 1911(b) (presumptive tribal jurisdiction); 25 USC 1918 (tribal reassumption of jurisdiction); 25 USC 1919 (authorization for states and tribes to enter into jurisdictional agreements). We thus conclude that Congress was well aware of the jurisdictional issues central to ICWA, yet chose not to make the mere triggering of the notice requirement in 25 USC 1912(a) a jurisdictional issue. See *Antoinette S*, 104 Cal App 4th at 1410-1411 (holding that violations of the 25 USC 1912(a) waiting period are not jurisdictional and reasoning that "if [the] error were to strip a court of its jurisdiction . . . , then the juvenile court would lose all authority over the dependent child in its care, requiring immediate return of the child to parents who have demonstrated at least temporary unfitness"). Whether the tribal court has exclusive, presumptive, or no jurisdiction over the matter cannot even be determined in the absence of proper notice to the tribal authorities.

Therefore, we conclude that the mere triggering of the notice requirement does not strip the trial court of jurisdiction over the children and does not mandate automatic reversal of all proceedings occurring after the notice requirement was triggered. The requirement to provide tribal notice under 25 USC 1912(a) is the *means* by which a court determines its jurisdiction, but is not itself a divestiture of jurisdiction.

We also do not believe that automatic reversal would be in the best interests of the children. In the majority of cases involving ICWA-notice violations that were conditionally affirmed by the Michigan Court of Appeals, it was eventually determined that the children were not Indian children and thus that ICWA did not apply. An automatic-reversal rule would require new termination proceedings in even the cases not involving Indian children, and this would disrupt or delay the permanent placement of the child. It would be counterproductive and nonsensical to disrupt the permanent placement of a child before it is determined whether the child is an Indian child. Additionally, an automatic-reversal rule would not conserve judicial resources because it would require the invalidation of all orders entered when there was an ICWA-notice violation, even if it is later determined that the child is not an Indian child.

Finally, the automatic-reversal remedy would be inconsistent with our longstanding disfavor of automatic reversals. See *In re Osborne*, 459 Mich 360, 369; 589 NW2d 763 (1999). Therefore, without a showing that ICWA even applies to the foster care or termination of parental rights proceedings, i.e., that the child is an Indian child, we decline to adopt a rule of automatic reversal.[28]

Our choices thus narrow to either the conditional-reversal or the conditional-affirmance remedy. Other jurisdictions have employed one or the other remedy to ICWA tribal-notice violations. See, e.g., *In re Elizabeth W*, 120 Cal App 4th 900, 908; 16 Cal

---

[28] However, when an appellate court can conclude from the record properly before it that a child *is* an Indian child entitled to the benefits and protections of ICWA, an outright reversal may be an appropriate remedy if the trial court failed to apply ICWA's standards.

33

Rptr 3d 514 (2004) (conditional reversal); *In re REKF*, 698 NW2d 147, 151 (Iowa, 2005) (conditional affirmance).

From a practical perspective, we realize there is little difference between the conditional remedies: both require a remand to remedy the notice violation. A conditional affirmance merely states that the lower court ruling is affirmed unless ICWA applies, whereas a conditional reversal states that the ruling is reversed unless ICWA does not apply. Under either remedy, if the child is determined to be an Indian child, then the foster care or termination proceedings are invalidated and the proceedings begin anew under ICWA's standards. If no Indian child is involved, however, or the tribe given proper notice does not respond within the times allotted by 25 USC 1912(a), any notice violation is harmless.

As far as the best interests of the children, there is again little difference between the conditional-affirmance and conditional-reversal remedies. Under either remedy, the children will likely stay in their current placements until the notice violation is resolved, and thus their permanency is not unduly affected in the interim. Additionally, there is no difference between these remedies as far as conserving judicial resources. Both require a remand to remedy the notice violation.

Nevertheless, in other ways, substantial differences exist between the two remedies. First, we think the use of a conditional reversal is more consistent with the text of 25 USC 1912(a), which mandates that "[n]o foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary . . . ." Second, between the two remedies, conditional reversal is more deferential to tribal interests, as expressed by

ICWA, and is more likely to ensure these interests are protected by the trial courts. The term "conditional reversal" sends a clearer signal to the lower courts and the DHS that they must pay closer attention when ICWA is implicated. In sum, we think that the conditional-reversal remedy is more emphatic, more consistent with the text and purposes animating ICWA, and more likely to encourage compliance with ICWA.

Therefore, we overrule *IEM* and its progeny and hold that conditional reversal is the proper remedy for violations of 25 USC 1912(a).[29]

## VI. CONCLUSION

We hold that the proper remedy for ICWA-notice violations is to conditionally reverse the trial court and remand for resolution of the ICWA-notice issue. In addition, we hold that virtually any criteria on which tribal membership might be based suffices to trigger the 25 USC 1912(a) notice requirement. We hold also that a parent of an Indian child cannot waive the separate and independent rights of an Indian child's tribe, as

---

[29] We also clarify another aspect of *IEM*. The Court of Appeals quoted with approval a Vermont case for the proposition that after remanding to the trial court for proper notice to the Indian tribe, "'[i]f the tribe does not seek to intervene, or after intervention the trial court still concludes that the ICWA does not apply, the original orders will stand.'" *IEM*, 233 Mich App at 450, quoting *In re MCP*, 153 Vt 275, 289; 571 A2d 627 (1989). This language has since been repeated in ICWA-notice cases. See, e.g., *In re BJ & GH*, unpublished opinion per curiam of the Court of Appeals, issued June 10, 2003 (Docket No. 242892); *In re Burgett*, unpublished opinion per curiam of the Court of Appeals, issued March 11, 2008 (Docket No. 280642). The above-quoted language erroneously implies that even if the child is determined to be an Indian child, it would be proper to affirm an involuntary foster care placement or termination of parental rights determination made under state law—in the absence of ICWA's protections—if the Indian tribe chose not to intervene. If the child meets the definition of Indian child, ICWA applies, regardless of whether the Indian tribe chooses to intervene in the state-court proceedings.

35

guaranteed by ICWA. Lastly, we hold that the trial court must maintain a documentary record including, at minimum, (1) the original or a copy of each actual notice personally served or sent via registered mail pursuant to 25 USC 1912(a), and (2) the original or a legible copy of the return receipt or other proof of service showing delivery of the notice.

In *In re Morris* we reverse the judgment of the Court of Appeals with regard to the use of the conditional-affirmance remedy, conditionally reverse the trial court's termination of parental rights, and remand to the trial court for resolution of the ICWA-notice issue. In *In re Gordon* we reverse the judgment of the Court of Appeals, conditionally reverse the trial court's termination of parental rights, and remand to the trial court for resolution of the ICWA-notice issue. On remand, the trial courts shall first ensure that notice is properly made to the appropriate entities. If the trial courts conclusively determine that ICWA does not apply to the involuntary child custody proceedings—because the children are not Indian children or because the properly noticed tribes do not respond within the allotted time—the trial courts' respective orders terminating parental rights are reinstated. If, however, the trial courts conclude that ICWA does apply to the child custody proceedings, the trial courts' orders terminating parental rights must be vacated and all proceedings must begin anew in accord with the procedural and substantive requirements of ICWA. We do not retain jurisdiction.

> Michael F. Cavanagh
> Robert P. Young, Jr.
> Marilyn Kelly
> Stephen J. Markman
> Diane M. Hathaway
> Mary Beth Kelly
> Brian K. Zahra

36

APPENDIX:

AN OVERVIEW OF THE 25 USC 1912(a) NOTICE PROCESS

To aid our lower courts in properly applying the notice requirement of 25 USC 1912(a), we offer the following cursory overview. While this overview begins at the preliminary hearing, we recognize that the Department of Human Services, pursuant to its own policies and procedures, will have previously begun the process of gathering the information necessary to determine the applicability of the Indian Child Welfare Act (ICWA). As noted in the opinion, for more comprehensive guidance, see ICWA Special Committee, *Indian Child Welfare Act of 1978: A Court Resource Guide* (State Court Administrative Office, 2011) (SCAO ICWA Resource Guide).

1. At the preliminary hearing, the court must inquire about Indian heritage. While MCR 3.965(B)(2) frames the inquiry in terms of actual tribal membership, sufficiently reliable information of virtually any criteria on which membership might be based is adequate to trigger the notice requirement of 25 USC 1912(a). See part IV(A) of the opinion. As we have noted, not all tribes keep written rolls and it is possible for a parent to be unaware that she or he is a member of a tribe. See n 19 of the opinion and accompanying text.

2. If sufficient indicia of Indian heritage are presented to give the court a reason to believe the child is or may be an Indian child, determination of the tribal status of the child, the parents, or both requires notice pursuant to 25 USC 1912(a).

3. The trial court must identify the child's tribe[1] and ensure that the tribe receives notice of the proceedings. If the child's tribe cannot be determined, notice must be sent to the Bureau of Indian Affairs (BIA). See n 14 of the opinion and accompanying text. While MCR 3.965(B)(2) states that "the court must . . . notify the tribe," the court may discharge its duty by directing the petitioner to compose and send notice containing as much information as is reasonably available to provide the child's tribe, or the BIA when applicable, with the information needed to make the determination of tribal membership or eligibility for tribal membership. For a suggested list of the notice contents, see Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, B.5(b), 44 Fed Reg 67584, 67588 (November 26, 1979).

4. Notice must be made by personal service or sent by registered mail with return receipt requested. See n 22 of the opinion.

5. Other than temporary placements pending the tribal or BIA notification, the trial court may not conduct any foster care placement or termination of parental rights proceedings until (1) the expiration of the time periods stated in 25 USC 1912(a), or (2) the child's tribe or the BIA responds with information sufficient to allow the trial court to conclude that the child is not an Indian child within the meaning of ICWA. The possibility that the child is an Indian child does not divest the trial court of jurisdiction to order temporary foster care pending tribal notice. See part V of the opinion.

---

[1] For information on determining the child's tribe, see Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, B.2, 44 Fed Reg 67584, 67586-67587 (November 26, 1979); SCAO ICWA Resource Guide, pp 22-24.

6. When the tribe does not have exclusive jurisdiction under 25 USC 1911(a), if the child's tribe or the BIA responds with information sufficient for the trial court to conclude that the child is an Indian child within the meaning of ICWA and the child's tribe declines the transfer of jurisdiction or the trial court determines that there exists good cause to keep the matter in state court pursuant to 25 USC 1911(b), the substantive and procedural protections afforded by ICWA still apply to the proceedings. The application of ICWA to the state-court proceedings does not depend on whether the tribe chooses to intervene. See n 29 of the opinion. If the child is an "Indian child," ICWA applies. See n 9 of the opinion and accompanying text.

7. The trial court has a duty to ensure the record includes, at minimum, (1) the original or a copy of each actual notice personally served or sent via registered mail pursuant to 25 USC 1912(a) and (2) the original or a legible copy of the return receipt or other proof of service showing delivery of the notice. In addition, the record should include any additional correspondence between the petitioner, the court, and the Indian tribe or other person or entity entitled to notice under 25 USC 1912(a).